IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| ALFRED HAZEL, JR. | : |
| Plaintiff, | : |
| | : Case No. 5:05-cv-321 (CAR) |
| v. | : |
| LA PETITE ACADEMY, INC., | : |
| Defendant. | : |

*ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

Plaintiff Alfred Hazel, Jr. ("Hazel") brings this action against his former employer, Defendant La Petite Academy ("LPA"), alleging that LPA discriminated against him based on his race (African-American) and gender (male), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.[1] Before the Court is LPA's Motion for Summary Judgment. [Doc. 26]. For the reasons discussed below, LPA's motion is **GRANTED**.

*BACKGROUND*[2]

Hazel is an African-American male formerly employed at one of LPA's child-care

---

[1] In his Response brief, Hazel further alleges claims of retaliation and breach of contract. Despite Hazel's assertion to the contrary, these claims appear nowhere in his complaint. [Doc. 1]. To the extent that Hazel attempts, through his Response brief, to raise these claims, the Court will not permit him to do so. "At the summary judgment stage, the proper procedure for [a] plaintiff[] to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004). Allowing Hazel to assert claims of retaliation and breach of contract for the first time on summary judgment would deprive LPA of proper notice of those claims as well as a sufficient opportunity to develop a defense. See id.

[2] The facts recited in this section are taken in the light most favorable to the plaintiff. Wherever necessary, and without further notation, any factual disputes appearing in the record have been resolved in favor of Hazel. See Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918-19 (11th Cir. 1993).

1

facilities in Macon, Georgia. LPA is a national corporation that operates early learning and school-age care facilities in 36 states. Hazel was hired as a teacher in LPA's North Macon academy on October 30, 1998. Eventually, Hazel applied for and received a promotion to Assistant Director. As Assistant Director, Hazel answered to the Director, June Woodall, a Caucasian female, who considered him an excellent employee. (Woodall Dep. 12). Woodall, in turn, answered to a District Manager, who supervised approximately twelve LPA facilities throughout Georgia.

In the fall of 2003, LPA hired Cindy Siegel, a Caucasian female, as the District Manager over the district in which the Macon academy was located. A few weeks later, Woodall resigned her position as Director of the Macon academy. Siegel then appointed Hazel as the academy's Acting Director while she searched for Woodall's replacement. Hazel and at least one other candidate applied for the Director position. After considering the applicants, Siegel selected Hazel as the Director. Sometime later, Siegal promoted Sara Ballard, a Caucasian female, to Assistant Director, to fill the vacancy created by Hazel's promotion.

As Director, Hazel was responsible for managing all aspects of the Macon academy's operations. His duties included representing LPA in interactions with parents, overseeing academy staff, operating the academy to meet LPA's financial goals, ensuring compliance with state licensing requirements, and submitting reports to the District Manager. (Hazel Dep. Exh. 8). When he became Director, Hazel inherited various operational problems. (Siegel Dep. 76-77, 82). These included a severe staff shortage, a record of state licensing violations, excessive past-due tuition balances, and a laggard maintenance service. (Hazel Dep. 47, 59-60, 124, 136-38, 150, 168-69, 175, 177-78 & Exh. 10). Though Siegel recognized that these problems pre-dated

2

Hazel's tenure as Director, she expected Hazel to correct them promptly upon assuming the Director position. (Siegel Dep. 76-77).

Despite his efforts, Hazel remained unable to fully correct all of the problems he inherited. For instance, throughout his tenure as Director, he interviewed several applicants to fill the vacant "teacher" positions, but was unable to find suitable candidates to hire. (Hazel Dep. 125-26). As a result, the academy remained short-staffed, and Hazel felt compelled to personally complete the various tasks that were left unperformed due to the staff shortage. (Hazel Dep. 124, 152, 167, 176, 185). When needed, he spent time in the classroom, drove the bus, cooked, and performed maintenance work. Consequently, Hazel fell behind on other administrative tasks, such as collecting past-due tuition payments, preparing and submitting reports, and counseling and disciplining employees. (Hazel Dep. 90, 124-127).

In addition, Hazel struggled to bring the academy in full compliance with state licensing requirements. During Hazel's tenure as Director, the Office of School Readiness ("OSR")—the agency responsible for inspecting child-care facilities and ensuring compliance with state licensing requirements—visited the Macon academy three times. (Hazel Dep. 127-34). On each visit, the OSR issued numerous citations. (Hazel Dep. 127-34 & Exhs. 10, 12 & 15). During the OSR's first visit, on November 21, 2003, the agency cited the academy for violating student-teacher ratio requirements and various maintenance codes. (Hazel Dep. Exh. 10). Due to the number of citations, the OSR issued Hazel a formal plan of improvement. (Hazel Dep. 132 & Exh. 10). It further informed him that future violations could jeopardize the academy's participation in the Georgia Pre-K program. (Hazel Dep. 132 & Exh. 10).

The OSR paid a second visit to the Macon academy on March 23, 2004. During its visit,

the OSR again cited the academy for violating student-teacher ratio requirements. (Hazel Dep. Exh. 12). It also issued a citation for dispensing medication without authorization. (Hazel Dep. Exh. 12). Following the OSR's second visit, Siegel emailed Hazel, expressing concern about the citations and admonishing him to take strong measures to prevent future violations. (Hazel Dep. Exh. 12).[3] She further instructed him to counsel all teachers on their duty to uphold licensing requirements, and terminate any who neglected that duty. (Hazel Dep Exh. 12).

The OSR visited the academy for a third time on June 10, 2004. (Hazel Dep. Exh. 15). Though it observed corrections of previous student-teacher ratio violations, the OSR noted several other violations, including the inappropriate use of discipline, a failure to keep the playground free of litter, and a failure to satisfy staff training requirements. (Hazel Dep. Exh. 15).

In addition to his staffing and licensing problems, Hazel floundered in collecting past-due tuition from parents. Shortly after Siegel took office, she made the collection of unpaid tuition fees a priority among the directors under her supervision. (Hazel Aff. Exh. S). Siegel insisted that all directors maintain past-due balances at a level no higher than $200.00 per week. In many weeks, Hazel had over $1,000.00 in past-due balances—translating to one of the highest percentages of delinquent balances in his region. (Hazel Dep. Exh. 11; Siegel Dep. Exh. 8). At least two other directors in the region experienced similar problems in bringing their past-due balances down to a level acceptable to Siegel. Displeased with their inability to collect past-due balances, Siegel sent Hazel and the other directors terse emails requesting explanations. (Hazel

---

[3] In particular, Siegel wrote: "It seems ridiculous to me that we are being cited for dispensing medication without authorization or that any classroom is out of ratio for any reason. That tells me that even the basics are not being followed up with." (Hazel Dep. Exh. 12).

4

Dep. Exh. 14; Hazel Aff. Exh. S). She also threatened to suspend or terminate those who continued with high balances. (Hazel Aff. Exh. S). Eventually, Hazel brought his past-due balances down to roughly $300.00 per week; however, his balances remained higher than most other directors in the region. (Hazel Dep. Exh. 17-18 (noting weekly balances ranging from $252.60 to $1655.11); Siegel Dep. Exh. 8 (noting parent receivable percentages for all directors in the region)).

In spite of the many problems Hazel faced as Director, his academy enjoyed tremendous growth in revenue during his tenure. (Hazel Aff. Exhs. L, M). In the first two quarters of the 2004 fiscal year, Hazel's academy posted the highest growth in revenue of any academy in his region and was recognized for exceeding budget expectations. (Hazel Aff. Exhs. L, M). Hazel also received congratulatory notes from the company's CEO and CFO. (Siegel Dep. Exh. 7). And, shortly before his termination, LPA rewarded him for the academy's financial performance with a $600.00 Visa card, to be used to throw a party for his employees. (Hazel Aff. Exh. Q).

Notwithstanding the financial success of Hazel's academy, Siegel remained dissatisfied with his job performance. On April 1, 2004, she issued the first of two "Performance Action Plans." (Hazel Dep. Exh. 13). The plan listed numerous areas requiring improvement, including Hazel's leadership, his failure to collect past-due tuition, and his inability to ensure compliance with state licensing requirements. (Hazel Dep. Exh. 13). The plan also detailed measures Siegel expected Hazel to take to improve his performance, and established time-frames in which he was expected to accomplish those measures. (Hazel Dep. Exh. 13).

On April 26, 2004, Siegel sent Hazel an email following up on various action plan items. She praised his improvement in minimizing tuition adjustments, but expressed concern about his

5

continued failure to collect past-due balances. (Def. App. Vol. III. p. 53 [Doc. 28-3]). She also noted that she was "still chasing [him] down for regular information on many occasions." (Def. App. Vol. III. p. 53 [Doc. 28-3]).

Several months later, in August 2004, Sara Ballard—the teacher promoted to Assistant Director following Hazel's promotion to Director—left LPA to become the director of a competing child care facility in Macon. (Siegel Dep. 34-35). Before Ballard left, Siegel met with her on several occasions outside of Hazel's presence. (Spencer Dep. 14-15). During their meetings, Ballard complained to Siegel about Hazel's performance, and cited his deficient leadership as one of the reasons for her departure. (Ballard Dep. 20-21). Siegel expressed her disappointment in Ballard's decision to leave LPA and told her: "I think you'd make a great director for us some day." (Siegel Dep. 35).

Shortly after Ballard left LPA, Siegel issued Hazel a second "Performance Action Plan." (Hazel Dep. Exh. 16). Like the first, the second plan identified several areas still needing immediate improvement, including Hazel's leadership and his inability to collect past-due parent balances. The plan further stated that it served as Hazel's "final written warning regarding overall job performance" and instructed him to meet all "expectations within 30 days or ... risk[] further disciplinary action up to and including termination." (Hazel Dep. Exh. 16). Siegel followed the action plan with two "Action Plan Updates," both noting Hazel's continued failure to improve. (Hazel Dep. Exhs. 17-18).

Meanwhile, Siegel began negotiating Ballard's return to the Macon academy. (Woodall Dep. 9). Siegel called Ballard on a weekly basis, each time offering her more money to return to the Macon academy as Director. (Woodall Dep. 9). Siegel also agreed to terminate Hazel and

6

other employees with whom Ballard had conflicts. (Woodall Dep. 11). Among the employees earmarked for termination were two African-American females: Vanessa Spencer and Sheila Bonner. (Woodall Dep. 11). After several weeks of negotiation, Ballard agreed to return to LPA on the conditions that: (1) she would receive an annual salary of between $34,000 and $35,000, and (2) Siegel would terminate Hazel, Spencer, and Bonner. (Woodall Dep. 9-11).

On October 6, 2004, Ballard resigned her position with the competing facility. (Webb Dep. 8-9). Eight days later, on October 14, 2007, Siegel terminated Hazel. (Hazel Dep. Exh. 19). On Hazel's severance slip, Siegel cited his substandard job performance and his inability to correct deficiencies as the reasons for his termination. (Hazel Dep. Exh. 19). After filing the requisite charge of discrimination with the EEOC and receiving a right to sue letter, Hazel filed the present lawsuit.

## *SUMMARY JUDGMENT STANDARD*

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and

make all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex, 477 U.S. at 323. "A mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that a jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).

## *DISCUSSION*

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual

8

with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). A plaintiff proceeding under Title VII may establish his or her claim through the introduction of direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination. Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1103 (11th Cir. 2001). In this case, Hazel alleges the existence of both direct and circumstantial evidence to support his race discrimination claims. Therefore, the Court will address both methods of proof in turn.

  A. **Direct Evidence**

Hazel argues that the fact that he was replaced by a white female who was paid a higher salary constitutes direct evidence of discrimination. This argument, however, is meritless. Direct evidence is "evidence, which, if believed, proves the existence of a fact without inference or presumption." Akouri v. Fla. Dep't of Transp., 408 F.3d 1338, 1347 (11th Cir. 2005) (quoting Burell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997)). In other words, direct evidence is evidence which reflects a discriminatory attitude correlating to the discrimination complained of by the employee. Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks omitted). The evidence must indicate that the complained-of discrimination was motivated by the decision-maker's racial or gender preferences. Id. As a result, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." Akouri, 408 F.3d at 1347 (internal quotation marks omitted).

9

Unquestionably, the evidence proffered by Hazel does not satisfy this rigorous definition.[4]

Hazel further argues that certain comments made by Siegel constitute direct evidence of discrimination. Specifically, Hazel alleges that Siegel told him that "she wanted the black employees 'gone'" and that "Ballard told Siegel that she would not come back unless black employees were terminated." (Pl.'s Resp. Br. 14). Unquestionably, these comments would suffice as direct evidence of discrimination. Unfortunately for Hazel, however, these comments appear nowhere in the record. Instead, they are a gross distortion of Hazel's testimony regarding remarks Siegel made to him during his tenure as Director. According to Hazel's testimony, Siegel asked him to fire certain employees—who happened to be African-American—because Ballard had disagreements with those employees. (Hazel Dep. 91-92; 104-05; 114). Nowhere does Hazel testify that Siegel even mentioned the employees' race, or urged him to fire them because of it. Accordingly, the remarks, as they actually appear in the record, fail to amount to direct evidence of discrimination.

B. **Circumstantial Evidence**

Having found no direct evidence of discrimination, the Court now turns to Hazel's circumstantial evidence. In evaluating employment discrimination cases based on circumstantial evidence, courts use the burden-shifting framework detailed in McDonnell Douglas Corp. v.

---

[4] Hazel cites the more flexible definition of direct evidence proposed in Wright v. Southland Corp., 187 F.3d 1287, 1293 (11th Cir. 1999) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic."). This definition, however, has received little support. See, e.g., Copley v. Bax Global, Inc., 80 F. Supp. 2d 1342, 1348 (11th Cir. 2000) (rejecting definition as "mere obiter dictum," noting that "it was not necessary to the resolution of the case, and neither of the two members of the panel joined that portion of the opinion."). In fact, the Eleventh Circuit has refrained from applying the definition in subsequent cases. See, e.g., Akouri, 408 F.3d at 1347; Wilson, 376 F.3d at 1086. Accordingly, the Court declines to apply this definition in the present case, and instead will follow the prevailing definition of direct evidence in this Circuit.

Green, 411 U.S. 792 (1972). Under the McDonnell Douglas framework, an employee must first demonstrate a prima facie case of discrimination. Id. at 802. If the employee establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). Once the employer provides a legitimate, non-discriminatory reason for its action, the employee's prima facie case is rebutted. Id. at 253. The employee must then show that the employer's proffered reasons for its actions were not the real reasons that motivated its conduct, but rather, the employer's proffered reasons were merely pretext for discrimination. Id.

Hazel alleges that he was terminated because of his race (African-American) and gender (male). It is undisputed that Hazel has satisfied his prima facie case. At issue is whether Hazel has provided sufficient evidence of pretext to overcome LPA's legitimate, non-discriminatory reason for terminating him.

LPA contends that it terminated Hazel because of his poor job performance. To support its contention, LPA has produced Hazel's "Performance Action Plans," reports from the OSR, emails from Siegel to Hazel, and other evidence documenting Hazel's poor performance. The defendant's burden to articulate a non-discriminatory reason is one of production, not persuasion. Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 778 (11th Cir. 2005). "So long as the employer articulates a clear and 'reasonably specific' non-discriminatory basis for its actions, it has discharged its burden of production." Id. Once the defendant does so, the plaintiff must persuade the trier of fact that the reasons proffered are merely pretext for discrimination. In light of the evidence presented by LPA, the Court finds that LPA has discharged its burden of production. Thus, to survive summary judgment, Hazel must establish that LPA's reason for

11

terminating him is pretext.

To show that a defendant's stated reasons are pretext, a plaintiff must offer evidence "demonstrat[ing] that the proffered reason was not the true reason for the employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). This the plaintiff may do "by showing both that the reason was false, and that discrimination was the real reason." Brooks, 446 F.3d at 1163 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)) (emphasis omitted). In determining whether a defendant's proffered reasons are pretext, courts must "be careful not to allow [plaintiffs] simply to litigate whether they are, in fact, good employees." Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002). The question courts must resolve is not the whether the employer's conclusion that the employee is unsatisfactory is a correct one, but "whether it is an honest one." Id. Thus, to demonstrate pretext, "a plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by race." Alexander v. Fulton County, 207 F.3d 1303, 1339 (11th Cir. 2000).

In his Response brief, Hazel lists several reasons why LPA's explanation for his termination is pretextual. (Pl.'s Resp. Br. 13). Having considered Hazel's arguments, the Court finds that none of the reasons he articulates gives rise to a genuine issue of material fact as to whether LPA's decision to terminate him was motivated by race or gender discrimination.

Hazel first argues that LPA's explanation is pretextual because other directors experienced performance problems similar to his, but were not placed on "Performance Action Plans." Certainly, the record demonstrates that, like Hazel, other directors in Hazel's region experienced difficulty in collecting delinquent tuition payments from parents. (Siegel Dep. Exh. 8). However, Hazel's failure to collect past-due balances was only one of the many reasons for

which he was placed on a "Performance Action Plan."  Because there is no evidence suggesting that the other directors, like Hazel, had the number of additional performance problems that Hazel had, Hazel's argument fails to undermine LPA's stated reason for terminating him.  Absent evidence that the other directors experienced performance problems in addition to their inability to collect past-due balances, LPA was entitled to punish Hazel more harshly than those other directors.  Cf. Knight v. S. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (noting that to create an inference of discrimination based on disparate treatment, employees must be involved in similar misconduct and disciplined in different ways).

Second, Hazel argues that LPA's explanation is pretext because many of the problems identified in his two "Performance Action Plans" pre-dated his tenure as director.  LPA concedes that the problems in staffing, collecting past-due parent balances, and ensuring compliance with state licensing requirements pre-dated Hazel's tenure; however, it argues that it expected Hazel, as Director, to "take steps 'to begin the process of improvement'" with respect to those problems.  (Def.'s Reply Br. 5).  The Court agrees.  The fact that many of Hazel's problems pre-dated his tenure does not call into question LPA's reason for terminating him.  The problems that Hazel inherited occurred under a different District Manager, and when LPA hired Siegel—mere weeks before Siegel promoted Hazel to Director—Siegel was entitled to impose greater expectations upon her subordinates than her predecessor.  Cf. Rojas, 285 F.3d at 1343 ("Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important.").  With respect to Hazel's directorship, therefore, Siegel was entitled to expect him to resolve the problems that he had inherited, and to terminate him when he failed to meet her expectations.  Cf. Combs v.

Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997) (stressing that a plaintiff may not establish that an employer's proffered reason is pretextual "merely by questioning the wisdom of the employer's reason, at least not where. . .the reason is one that might motivate a reasonable employer."); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions") (internal quotation marks omitted); Nix v. WLCY Radio / Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[A]n employer may [act] for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). In this context, therefore, the fact that Hazel was punished for failing to correct problems that pre-dated his tenure fails to demonstrate that LPA's decision to terminate him was motivated by discrimination.

Third, Hazel argues that his success in increasing the Macon academy's revenue growth and exceeding budget expectations undermines LPA's proffered explanation for his termination. Hazel's argument, however, treads perilously close to "allowing [him] simply to litigate whether [he was], in fact, [a] good employee[]." Rojas, 285 F.3d at 1342. Indeed, employers are entitled to value certain performance standards over others, as long as they do so in a race and gender-neutral manner. Cf. Nix, 738 F.2d at 1187 ("[A]n employer may [act] for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). Accordingly, the fact that Hazel's performance exceeded expectations in some areas does not create a genuine issue of material fact as to the motivation underlying his termination.

Fourth, Hazel points to the fact that Siegel began recruiting Ballard before she terminated

him.  Like Hazel's previous arguments, this fact fails to demonstrate that LPA's decision to terminate Hazel was motivated by discrimination.  By the time Ballard left LPA, Hazel had already received one "Performance Action Plan" as well as multiple citations from the OSR.  Considering Hazel's disappointing performance, together with Ballard's educational credentials (a Bachelor's degree with a minor in Early Childhood Education), Siegel was entitled to believe that Ballard would do a better job than Hazel as Director.  She was also entitled to act on that belief by recruiting Ballard once Ballard left LPA.

Finally, Hazel argues that the fact that Ballard has not done a better job as Director of the Macon academy demonstrates pretext.  As a threshold matter, it is unclear whether the record even supports such an inference.  At most, disregarding Ballard's favorable performance reviews, records demonstrating considerably lower past-due balances, and OSR inspection reports noting fewer licensing violations, a trier of fact could find Ballard's performance to be no better than Hazel's.  However, even assuming that Ballard were no better a Director than Hazel, there is no evidence to suggest that LPA's preference of Ballard over Hazel was rooted in discrimination.  At the time Siegel began recruiting Ballard, Siegel had no indication that Ballard's performance would not be better than Hazel's.  Siegel was entitled to believe, for reasons unrelated to Ballard's race or gender, that she would make a better director than Hazel.[5]

For the reasons discussed above, Hazel's evidence fails to call into doubt the credibility of LPA's proffered reason for terminating him, or otherwise establish that LPA's actions were motivated by a discriminatory intent.  Because Hazel has failed to create a genuine issue of

---

[5] Even assuming that Ballard had attendance or performance problems before becoming Director, there is no evidence that Siegel knew of these problems.  Hazel himself admitted that he neither disciplined Ballard nor reported her behavior to Siegel, explaining that he was "too busy" to do so.  (Hazel Dep. 89-90).

material fact as to whether his termination was the result of race or gender discrimination, LPA's Motion for Summary Judgment is **GRANTED**.

## *CONCLUSION*

For the reasons discussed above, LPA's Motion for Summary Judgment [Doc. 26] is **GRANTED**.


**SO ORDERED,** this 26th day of March, 2007.

S/ C. Ashley Royal  
C. ASHLEY ROYAL  
UNITED STATES DISTRICT JUDGE

AEG/ehe